# UNITED STATES DISTRICT COURT

# DISTRICT OF ALASKA

| CLEAR, LLC, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | 3:07-cv-00110 JWS |
| | ) | |
| vs. | ) | ORDER AND OPINION |
| | ) | |
| AMERICAN AND FOREIGN INSURANCE COMPANY, | ) | [Re: Motions at dockets 32 and 46] |
| | ) | |
| Defendant. | ) | |

## I. MOTIONS PRESENTED

At docket 32, defendant American and Foreign Insurance Company ("American") moved for summary judgment against plaintiff Clear, LLC ("Clear"). At docket 46, Clear moved for partial summary judgment against American. The motions have been fully briefed. Oral argument was heard on March 7, 2008.

## II. BACKGROUND

This lawsuit arises from construction of the Alaska Native Heritage Center in Anchorage, Alaska ("Center"). In May of 1998, the Anchorage Native Heritage Center Incorporated ("Owner") contracted with Gaston and Associates ("Gaston") to act as the general contractor for construction of the Center. The Center was designed by RIM Architects ("RIM"). Gaston engaged subcontractors to construct various aspects of the Center. For example, a sub-contractor named Four Winds was the framing subcontractor. Its work included framing the Center's roof. Another subcontractor was Cottonwood Roofing which installed the exterior of the roof. Another subcontractor was

Udelhoven Oilfield Services, Inc., which was engaged to perform the mechanical, plumbing, and electrical work on the Center. Gaston, as general contractor, was tasked with inspecting the work of its subcontractors and was responsible to the Owner for the adequacy of all work under its contract with the owner whether the work was performed by Gaston or by a subcontractor.

Construction of the Center was substantially completed by mid-March 1999. By January of 2000, it became apparent that there were serious problems with the building. Eventually, litigation ensued in which the Owner sued Gaston and its bonding company who joined RIM as a third-party defendant. Following a lengthy bench trial, Alaska Superior Court Judge Sen Tan issued findings of fact and conclusions of law in August 2007. Judge Tan ruled in favor or RIM on Gaston's third-party claim. He ruled against Gaston on the Owner's claims and awarded the Owner contract damages in an amount exceeding $2,000,000. After Judge Tan's decision was rendered, Gaston, its bonding company, and the Owner negotiated a settlement pursuant to which Gaston and the bonding company agreed to pay the Owner $2,400,000, and to vacate Judge Tan's decision as it affected the Owner, Gaston, and the bonding company. Judge Tan's decision absolving RIM of responsibility remains in effect.

The instant lawsuit was commenced in state court by Clear and timely removed to this court by American. In its complaint, Clear seeks a declaration of its rights under three insurance policies issued to Gaston by American providing certain insurance coverages to Gaston. These are policy A SP-2006950097 covering the period from June 1, 1997 to June 1, 1998; policy A SP-2006950098 which covered the period from June 1, 1998 to June 1, 1999; and policy A SP-2006950099 covering the period from June 1, 1999 to June 1, 2000. The relevant terms of each of these insurance policies (aside from the period during which coverage was provided) are identical for all purposes relevant to this lawsuit. For simplicity, in this order, the three insurance policies are referred to both collectively and singularly as "the Policy." The Policy provided several coverages, including comprehensive general liability coverage ("CGL"), to Gaston. In addition to seeking a declaration of its rights under the Policy, Clear

seeks to recover damages for American's alleged failure to honor its obligations to indemnify Gaston under the Policy.

In its complaint Clear alleges that it is the successor in interest to Gaston and also holds some rights obtained from the Owner in connection with the "Concrete Claim."[1] In its Answer, American did not admit Clear's allegations regarding its standing to pursue the claims pled in the complaint, but for purposes of the pending motions, Clear's standing is not challenged by American.[2]

American's motion was filed prior to the time it learned of the settlement between the Owner and Gaston. As part of that settlement, the Superior Court decision as between the Owner, Gaston, and the bonding company was vacated.[3] To the extent that American's motion depends on that decision, its foundation has disappeared. That is not to say that the motion necessarily is without any merit. American's motion asks the court to rule as a matter of law that American owes no duty to Clear under the Policy. American's briefing focuses on the following six legal questions:

> 1) Must [American] indemnify Clear for the damages awarded to [the Owner] for defective workmanship? * * *
>
> 2) Must [American] indemnify Clear for damages to non-defective work which had to be removed and replaced to repair the defective work? * * *
>
> 3) Must [American] indemnify Clear for damages to [the Center] which arose from [Gaston's] defective workmanship.
>
> 4) Must [American] indemnify Clear for defective work [Gaston's] subcontractors performed? * * *

---

[1] In addition to the third-party claim against RIM, Gaston pled a third-party claim against Klondike Concrete Company with respect to certain concrete work done on the Center. According to Clear's briefing, that claim was severed from the other claims and tried separately before Judge Tan. Prior to a decision by Judge Tan, Gaston funded a settlement with the Owner respecting the concrete work at issue. *See* doc. 47 at p. 11.

[2] This point was established on the record during oral argument.

[3] Doc. 47, Ex. 1.

-3-

> 5) Must [American] indemnify Clear for damages to the Owner which arose from defective workmanship by [framing subcontractor] Four Winds Framing & Finish? * * *
>
> 6) Must [American] indemnify Clear for any property damage which occurred after [American's] policy period.[4]

In its motion for partial summary judgment, Clear asks the court to rule as a matter of law that the following propositions are correct:

> 1. That the claim asserted against [Gaston] by [the Owner] ("the Claim") was the result of an "occurrence" as that word is defined in the ["Policy."]
>
> 2. That the Claim included a demand for compensation for "property damage" as that phrase is defined in the Policy.
>
> 3. That the property damage for which compensation was demanded by [the Owner] occurred during the policy period of the Policy.
>
> 4. That exclusions 2(j)(5) and (6) of the Policy do not apply because the property damage for which compensation was demanded was within the "products completed operations hazard" as that phrase is defined in the Policy.
>
> 5. That exclusion 2[L] of the Policy does not apply because the damaged work or the work out of which the damage arises was performed on Gaston's behalf by a subcontractor.
>
> 6. That the payments made pursuant to the [Gaston-Owner] settlement agreement included sums that the insured becomes legally obligated to pay as damages because of property damage to which the Policy applies.[5]

This court has jurisdiction pursuant to 28 U.S.C. § 1332, because the parties are diverse and the amount in controversy exceeds $75,000. The substantive law which controls resolution of this case is the law of the State of Alaska.

---

[4]Doc. 33 at p. 12.

[5]Doc. 46 at p. 2.

-4-

## III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted when there is no genuine dispute about material facts and when the moving party is entitled to judgment as a matter of law. The moving party has the burden to show that material facts are not genuinely disputed.[6] To meet this burden, the moving party must point out the lack of evidence supporting the nonmoving party's claim, but need not produce evidence negating that claim.[7] Once the moving party meets its burden, the nonmoving party must demonstrate that a genuine issue exists by presenting evidence indicating that certain facts are so disputed that a fact-finder must resolve the dispute at trial.[8] The court must view this evidence in the light most favorable to the nonmoving party, must not assess its credibility, and must draw all justifiable inferences from it in favor of the nonmoving party.[9]

## IV. DISCUSSION

### A. The Policy Provisions

The coverage at issue is the Policy's CGL coverage for "property damage." That coverage is set out in pertinent part as follows:

> **1. Insuring Agreement**
> **a**. We will pay those sums that the insured becomes legally obligated to pay as damages because of . . . "property damage" to which this insurance applies.
>
> **b**. This insurance applies to . . . "property damage" only if
>   **(1)** The . . . "property damage" is caused by an "occurrence" . . . and;
>   **(2)** The . . . "property damage" occurs during the policy period.[10]

---

[6] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[7] *Id.* at 325.

[8] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

[9] *Id.* at 255; *Soldano v. United States*, 453 F.3d 1140, 1143 (9th Cir. 2006) (citation omitted).

[10] Doc. 33, Exhibit C at p. 3 of 30.

Like most insurance contracts, the Policy contains coverage exclusions. Those which appear pertinent to the instant motions are the following:

**2. Exclusions**

This insurance does not apply to:[11]

**j. Damage to Property**
   "Property damage" to:

   (5) That particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the "property damage" arises out of those operations; or

   (6) That particular part of any property that must be restored, repaired or replaced because "your work" was incorrectly performed.
[Excepted from this exclusion (6) is] "property damage" included in the "products-completed operations hazard."[12]

**l. Damage to Your Work**

"Property damage" to "your work" arising out of it or any part of it and included in the "products-completed operations hazard".
This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor.[13]

**m. Damage to Impaired Property or Property Not Physically Injured**

"Property damage" to "impaired property" or property that has not been physically injured arising out of:

   (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or

   (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

---

[11] *Id.*

[12] *Id.* at pp. 5-6 of 30.

[13] *Id.* at p. 6 of 30.

-6-

> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.[14]

The Policy defines several of the terms used in the preceding sections of the Policy as follows:

> 7. "Impaired property" means tangible property other than "your product" or "your work", that cannot be used or is less useful because:
>     a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
>     b. You have failed to fulfill the terms of a contract or agreement;
> if such property can be restored to use by:
>     a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
>     b. Your fulfilling the terms of the contract or agreement.[15]
>
> 12. "Occurrence" means an accident including continuous or repeated exposure to substantially the same harmful conditions.[16]
>
> 14. "Products-completed operations hazard"
>     a. Includes all . . . . "property damage' . . . arising out of "your product" or "your work" [with exceptions not pertinent here].[17]
>
> 15. "Property damage" means:
>     a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
>     b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.[18]

---

[14]*Id.*

[15]*Id.*, at p. 13 of 30.

[16]*Id.*, at p. 14 of 30.

[17]*Id.*

[18]*Id.*, at p. 15 of 30.

-7-

19. "Your work" means:
   a. Work or operations performed by you or on your behalf; and
   b. Materials, parts or equipment furnished in connection with such work or operations.

   "Your work" includes:
   a. Warranties or representations made at any time with respect to the fitness, quality, durability, performance or use of "your work, and
   b. The providing of or failure to provide warnings or instructions.[19]

It will facilitate understanding the court's analysis of the Policy's coverage and exclusions set out in subsection C, below, to bear in mind that "your work" includes both Gaston's work and the work of its subcontractors (work done "on behalf" of Gaston).

## B. Facts

### Undisputed Facts

Upon review of the parties' motion papers and attachments, the court concludes that the material facts outlined in this subsection, as well as those set out previously in the Background section of this order, are not disputed for purposes of the pending motions. The Center was substantially completed by mid March 1999. By early 2000 problems including heat loss, ice forming on the roof, and water dripping from the ceilings had been discovered. Water dripping from the ceiling continued through the winter. The observed problems were initially investigated by RIM which found that they resulted from warm, moist interior air moving into the roof cavity through the vapor retarder, condensing there, and leaking back into the building in the form of water. Later, similar problems with moisture penetration were also discovered in the walls.

Further investigations, including test cuts at various locations in the roof, established that the problems with the roof were due to inadequate vapor retarder, undersized ventilation holes, blocked ventilation, missing insulation, defective blocking, torn vapor retarder, unsealed penetrations in the vapor retarder, lapped but unsealed

---

[19] *Id.*

vapor retarder, vapor retarder not adequately anchored to the structure, and missing insulation. Test cuts in the roof also revealed scattered wet plywood sheets in the roof decking. Test cuts in the walls also revealed extensive failures in the vapor retarder system. There was damage to interior dry-wall which was water stained and damage to the exterior wall finish which was also water stained. Window frames were damaged. The bollards installed by a Gaston subcontractor failed after the Center was occupied due to water problems.

The problems found in the roof and the walls were caused by defective work done by Gaston and defective work done by its subcontractors. Fixing the Center required removal of undamaged materials in order to access the areas where repairs were needed. In the course of the repair work in addition to some wet plywood, some wet insulation was found. Portions of these wet materials had begun to mold, and rot was discovered in a portion of the wet plywood.

**Disputed Facts**

Although one or the other of the parties may contend otherwise with respect to any individual item, the court finds the following on the basis of the available record. Which items of property damage were caused by Gaston's own faulty work and which resulted from faulty subcontractor work is disputed. The extent to which portions of the Center were damaged by faulty subcontractor work is disputed. The extent to which undamaged portions of the Center had to be removed and replaced so that repairs of property damaged by subcontractors could be made is disputed (as distinguished from removal and replacement to repair damages caused by Gaston). The extent to which particular items of property damage to the Center occurred while the Policy was in effect is disputed.

The following passage from Clear's briefing is Illustrative of the tangled nature of the facts relating to the damage to and repair of the Center:

> The costs of removing and replacing water damaged plywood sheathing and insulation is not specifically identified [in the repair contractor's bid]. Rather, it is included in a lump sum $422,637 damage item. Affidavit of Calvin Myrick. There was nothing "defective" about the shingles. Similarly not all of the plywood sheathing was wet and moldy only some of it was.

-9-

Nevertheless, the only way to know for sure what was or was not damaged was to investigate by removing the entire roof.[20]

In a more general way, the complexity of the factual situation is reflected in the positions taken by the parties. For its part, American has paid for some of the repairs because it acknowledges there is coverage, has paid for some other repairs because the coverage question is close, and has refused to pay for other repairs on the grounds that there is no coverage or an exclusion applies. For its part, Clear acknowledges that not all of the money paid in the settlement between Gaston and the owner relates to repair work which falls within the coverage and outside all pertinent exclusions, but takes the position that much more falls within the coverage and outside the pertinent exclusions than has been acknowledged by American.

Relying on Washington law,[21] Clear contends that American cannot segregate damages arising from covered events from those arising from non-covered events when both stem from the same factual core and the damages cannot be allocated. Assuming that is the law in Alaska, the record is inadequate to permit the court to rule as a matter of law exactly how much of the damages for which Clear is entitled to recompense arose from the same core of facts as those for which it is not entitled to be paid. Neither can the court rule as a matter of law that such damages cannot be allocated. These are matters which must be reserved for the trier-of-fact.

## C. Legal Issues

### Coverage

Only those portions of the settlement between Gaston and the Owner which pertain to property damage caused by an occurrence fall within the CGL coverage. It is appropriate to consider the coverage dispute in light of the Alaska Supreme Court's decision in *Fejes v. Alaska Ins. Co., Inc.*[22] That case involved interpretation of CGL

---

[20]Doc. 47 at p. 9.

[21]Clear cites *Public Untility District No. 1 v. Int'l Ins. Co.*, 881 P.2d 1020, 1033 (Washington 1994).

[22]984 P. 2d 519 (Alaska 1999).

coverage under an insurance policy sufficiently similar to the CGL coverage under examination here to make the *Fejes* court's analysis highly instructive. Although American relies on cases from other jurisdictions, to the extent that the *Fejes* court has provided an analytical framework for the dispute at bar, this court must agree with Clear when it says: "*Fejas* controls and is well reasoned. Whether it represents the minority view or not is irrelevant. It is the law in Alaska."[23] There, a building contractor ("Fejes") was sued by a homeowner when a curtain drain–a device constructed to protect the home's septic system leach field from ground water penetration–failed causing such severe damage to the septic system that it had to be replaced with a large holding tank. The curtain drain had been constructed by a sub-contractor and the septic system by the contractor.

Fejes tendered defense of the homeowner's suit to his insurer pursuant to the CGL coverage. The insurer rejected the tender. The homeowner prevailed in the suit against the contractor. Fejes then sued his insurance company. The trial court ruled in favor of the insurer finding that there was neither an occurrence nor property damage within the meaning of the CGL coverage. The Alaska Supreme Court reversed. The appellate court explained that the defective work of the subcontractor was an occurrence, because the damage it caused to the leach field was properly construed as an accident. In holding that the destruction of the leach field was property damage within the meaning of the insurance policy, the Alaska court firmly rejected the insurer's arguments that loss of the septic system represented "loss-of-bargain" damages and that CGL coverage is limited to coverage for "tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained."[24]

This court reads *Fejes* to establish that CGL coverage of the type American provided here extends to property damage resulting from a subcontractor's defective

---

[23]Doc. 47 at p. 20. Whether *Fejes* is as well-reasoned as the cases from other states relied upon by American may be an interesting topic of discussion, but it is not a discussion which may properly engage this court whose obligation is to apply the Alaska law.

[24]*Id.* at 984 P. 2d 524.

-11-

work whether or not the property damaged constitutes work the general contractor performed. This court has no trouble extending the reach of *Fejes* to say that defective work by the general contractor which damages other property falls within the CGL coverage, because the same analysis by which the Alaska court concluded that the subcontractor's work was an accident supports the conclusion that the general contractor's own defective work damaging other property was an accident. Under Alaska law and the terms of the Policy, there is CGL coverage for all property damage to the Center arising from Gaston's defective work and its subcontractors' defective work. Furthermore, because making repairs to this covered property damage necessarily includes the costs involved in removing and replacing other materials to gain access to the damaged property, such costs would seem to fall within the CGL coverage when the customary cannons of insurance policy interpretation are applied. That they do fall within the coverage is clear from the Policy language itself. Exclusion [discussed below] would not read the way it does were the costs of dealing with uninjured property not within the CGL coverage. That said, it is necessary to consider the exclusions contained in the Policy.

**Exclusions**

In *Fejes* the insurance policy contained an exclusion (A)(2)(d) which eliminated coverage for damage to "that particular part of any property . . . (ii) out of which any property damage arises, or (iii) the restoration, repair or replacement of which has been made or is necessary by reason of faulty workmanship thereon by or on behalf of the insured."[25] The insurance company attempted to use the exclusion to avoid paying for the tank which replaced the destroyed septic system on the basis that the tank was, in effect, a repair of the septic system. The Alaska court expressly rejected that argument in favor of Fejes' assertion that the curtain wall was the faulty work involved, and the home owner had not made a claim for the curtain wall. The Alaska court said:

> We reject [the insurer's] argument as an overly broad interpretation of the exclusion. Fejes's interpretation is reasonable; the exclusion **would exclude** claims for the cost of repairing or replacing the curtain drain, **but**

---

[25] *Id.*

-12-

Case 3:07-cv-00110-JWS   Document 120   Filed 03/24/08   Page 12 of 17

**not** the cost of the alternative waste disposal system made necessary by the failure of the curtain drain.[26]

The Alaska Supreme Court has established Alaska law with respect to the interpretation of such insurance policy provisions. Comparison of exclusions j (5) and (6) in the Policy show that they are the equivalent of exclusions (d) (ii) and (iii) in the policy at issue in *Fejes*. That being so, this court reads the *Fejes* decision to instruct that the Policy's exclusions j (5) and (6) should be read together to exclude any damages which represent the cost of repairing or replacing any property constituting defective work done by *Gaston* or its subcontractors, but not to exclude coverage for repairing or replacing any damaged property which is not itself defective work.

The basic CGL policy form in *Fejes* contained an exclusion (o) for "property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof or out of materials parts or equipment furnished in connection therewith."[27] That exclusion was narrowed by a policy endorsement which replaced it with a series of other exclusions. The exclusion pertinent to the present discussion was exclusion (A)(3) in Fejes' policy which was the same as exclusion (o) in the policy form with one critical difference. Exclusion (A)(3) omitted language excluding work which was performed on behalf of the named insured, in other words, work performed by a subcontractor. This distinction led the Alaska court to write: "Exclusion (A)(3) removes coverage as to property damage or work performed by the named insured, but not by someone on behalf of the named insured."[28] In exclusion l, the Policy contains the equivalent of Fejes' exclusion (A)(3). Thus, coverage for damaged property created by Gaston and damaged by Gaston's own defective work is eliminated, but damage to the Center arising out of the subcontractors' defective work is not. In reaching this conclusion, the court has considered American's argument based upon provisions in Gaston's contract with the Owner effectively making Gaston responsible to the owner

---

[26]*Id.* (emphasis added).

[27]*Id.*

[28]*Id.* at 985 P.2d 525.

-13-

for the work done by its subcontractors.  However, exclusion l as written does not apply to "work performed on your behalf by a subcontractor."  The contract between Gaston and the Owner does not change the insurance contract between Gaston and American.

In summary, then, the combined effect of exclusions j (5) and (6), and exclusion l is to foreclose claims by Clear against American arising from property damaged by Gaston's own work regardless of whether the damaged property is part of Gaston's defective work.  The exclusions do not foreclose Clear's claims arising from damage to property caused by the work of subcontractors.  There remains the question of whether claims may be pursued for the cost of repair and replacement of undamaged property arising from the need to make repairs to property damaged by subcontractors.

That question must be considered in light of an exclusion in the Policy which is of a type not specifically discussed in *Fejes*.  It is exclusion m.  By its terms, exclusion m would eliminate coverage for property that was not "physically injured" by either Gaston or its subcontractors.  Thus, exclusion m would eliminate coverage for the cost of removing and replacing property that was itself not physically injured in order to repair property that was physically injured.  Exclusion m itself contains an exception from its operation.  Specifically, loss of use of property that results from a sudden or accidental physical injury to work done by Gaston or its subcontractors is not excluded from coverage.

One way to read the exception is to say that it means exclusion m will apply in all cases excepting *only* those in which Gaston and the bonding company paid an Owner's claim for loss of use of the Center caused by a sudden or accidental physical injury.  The exception may be read more broadly.  If property which is not physically injured has to be removed to repair damaged property, then the Owner has lost the use of the uninjured property.  To get that use back, the originally uninjured property must be replaced.  Read that way, and harmonized with the other policy provisions already discussed, exclusion m would not eliminate coverage for the cost of removing and replacing uninjured property in order to remedy damage that is within the coverage provided by the Policy.

-14-

Finding the exception to exclusion m ambiguous and applying the customary and familiar rules of insurance policy interpretation,[29] this court concludes that the exception to exclusion m must be interpreted broadly–which has the effect of interpreting exclusion m itself narrowly–so that exclusion m does not exclude the cost of removing and replacing undamaged materials to the extent that such was necessary to remedy property damage caused by Gaston's subcontractors.

One last matter must be considered in connection with exclusion m. Removing uninjured property was necessary to repair both covered property damage and to repair defective work whose repair is not covered by the Policy. Clear contends that where the removal and eventual replacement is necessary in order to deal with both covered and non-covered damages, then the Policy must be construed to cover all of the removal and replacement costs. To support this position, Clear points to the Commercial Property Coverage ("PC") which was also included in the Policy. The PC coverage includes an exclusion for loss or damages resulting from specified causes or events and further recites that as to the excluded causes or events: "Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss."[30]

The short response to this argument would ordinarily be that it is a new argument raised for the first time in a reply and so will not be considered. However, the topic was discussed at oral argument, and American raised no objection to it consideration. On the merits, the court finds the argument unpersuasive. The problem with the argument is that the terms, conditions, types of risk, extent of coverage, nature of exclusions, and price of insurance varies greatly from one coverage type to another. The court would be walking on a slippery slope indeed were it to begin interpreting one type of coverage based on the contours of some other type of coverage. This court declines to create CGL coverage based on the omission of an exclusion contained in PC coverage.

---

[29]The basic rules are set out in many Alaska Supreme Court decisions. *See, e.g., Fejes* at 984 P.2d 522.

[30]Exhibit 34 to Clear's reply memo at docket 84.

-15-

Case 3:07-cv-00110-JWS   Document 120   Filed 03/24/08   Page 15 of 17

Based on *Fejes*, the customary cannons for interpreting insurance policies, and the language of the Policy itself, this court concludes that Clear is entitled to recover that portion of the settlement with the Owner which consists of the reasonable costs to repair property damage caused by the defective work of Gaston's subcontractors, including the cost of removing and replacing property that was not injured when that removal and replacement was necessary in order to fix the damage caused by a subcontractor's work.

**Parties' Specific Questions**

The court turns first to the specific questions identified by American.[31] They are paraphrased here. [1] Must American indemnify Clear for property damage based on defective workmanship? The answer is yes, but **only** to the extent the property damage was caused by the defective workmanship of a subcontractor. [2] Must American indemnify Clear for damages to non-defective work which had to be removed and replaced to repair defective work? The answer is that American must indemnify Clear for removal and replacement of non-injured property to the extent the removal was necessary to repair property damage caused by a subcontractor. [3] Must American indemnify Clear for damages which were caused by Gaston's own work? The answer is no. [4] Must American indemnify Clear for defective work subcontractors performed? The answer is no unless that work was damaged by a different subcontractor's defective work. [5] Must American indemnify Clear for property damage caused by the defective workmanship of subcontractor Four Winds? The answer is yes.

Next, the court turns to the specific questions posed by Clear.[32] They are paraphrased here. [1] Did the Owner's claim against Gaston ("the Claim") arise out of an "occurrence" as that term is used in the Policy? The answer is that some of it did. (2) Did the Claim arise from "property damage" as that term is used in the Policy? The answer is that part of it did. [3] Did the Claim arise from property damage which

---

[31]The questions are set out in American's briefing at doc. 33 p. 12 and were more fully described in Section II of this order.

[32]The questions are set out in Clear's briefing at doc. 46 p. 12 and were more fully described in Section II of this order.

-16-

occurred during the time the Policy was in effect? The answer for purposes of this motion is that at least some of it did. American having asked the court to rule as a matter of law that there were no such damages, the court must draw all reasonable inferences on this question in favor of Clear. The record supports an inference that property damage for which there is coverage occurred during the policy period.[33] [4] Do exclusions j (5) and (6) apply? The answer is yes, but only to the following extent: they exclude coverage for the cost of repairing or replacing defective work done by Gaston or its subcontractors. [5] Does exclusion l apply? The answer is that it applies to Gaston's own work which was damaged by Gaston's defective work, but it does not apply to any property damage caused by a subcontractor. [6] Did the settlement between Gaston and the Owner involve payments which Gaston became obligated to pay because of property damage covered by the Policy? The answer is that some of the payments Gaston was obligated to make arose from property damage covered by the Policy, and some of the payments did not.

## V. CONCLUSION AND SUGGESTION

The motions at dockets 32 and 46 are each **GRANTED in part** and **DENIED in part** consistent with the preceding discussion.

The court writes further to emphasize something the parties and their lawyers surely must realize. This is a dispute that calls out for a compromise resolution. What is at stake is money, not principle. The costs involved in pursuing this case through trial will reduce the value of any likely favorable outcome to a point where the inherent risk of a much less favorable outcome means the game is not worth the candle.

/s/ JOHN W. SEDWICK
UNITED STATES DISTRICT JUDGE

---

[33] *See* Clear's discussion of this topic at page 4 of its brief at doc. 47.